# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WILLIAM PERUGINI,           :
                              :
               Plaintiff,     :     NO. 3:05CV1289 (MRK)
                              :
v.                            :
                              :
STRYKER ORTHOPAEDICS,   :
                              :
             Defendant.    :

## MEMORANDUM OF DECISION

In this case, Plaintiff William Perugini sues his former employer, Stryker Orthopaedics ("Stryker"). *See* Complaint [doc. # 1]. Mr. Perugini claims that Stryker retaliated against him in violation of Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment Practices Act ("CFEPA") because he filed an internal complaint about a Hustler magazine that he found in his office mailbox. Mr. Perugini's principal claim of retaliation is that in response to his Hustler complaint, Stryker failed to offer him a position as a Trauma Sales Manager or a Trauma Sales Associate when his job as a Local Trauma Leader was eliminated in a company-wide reduction in force.

Mr. Perugini also asserts claims of breach of contract and promissory estoppel in connection with the investigation Stryker conducted regarding the Hustler incident. Currently pending before the Court is Defendant's Motion for Summary Judgment [doc. # 27]. For the reasons that follow, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's Title VII claim. Having disposed of the only federal claim in this case, the Court declines to exercise supplemental jurisdiction over his state law claims, which are therefore DISMISSED without prejudice to renewal in state court.

# I.

The following provides some factual background to Mr. Perugini's Complaint [doc. # 1]. Further facts will be recited, as needed, in later sections. As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to Mr. Perugini.

Stryker designs and manufactures reconstructive orthopedic implants and trauma devices, and sells these products in sales offices throughout the United States. Mr. Perugini joined Stryker in its Western New England ("WNE") branch in May 2002 as a "Local Trauma Leader" and remained with Stryker until he was laid off in connection with a company-wide reduction in force in January 2004. Before accepting the job of Local Trauma Leader, Mr. Perugini had declined three previous offers of employment with Stryker. In 1997 or 1998, Mr. Perugini rejected an offer for a sales representative position with the company because, in his words, "it was not a leadership position." Affirmation of Bryan T. Carmody in Support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [doc. # 31] Ex. D at 25-26 ("Perugini Transcript"). In 1999, he rejected a marketing position with Stryker because the position did not pay well enough. Finally, in 2001, Mr. Perugini declined a management-level position at another Stryker branch because taking the position would have required him to move.

As a Local Trauma Leader, Mr. Perugini supported the Stryker sales representatives in the area of trauma-related products. While his was not a management-level position, Mr. Perugini was expected to train sales representatives, to engage and lead them in order to drive sales of trauma products, to conduct sales visits, to assist in surgeries and procedures using Stryker products, and to keep the local branch updated on new products and offerings. S*ee, e.g.*, Carmody Aff. [doc. # 31] Exs. I, K, L. As a Local Trauma Leader, Mr. Perugini earned approximately $180,000 a year.

The claims in this case arise from an incident that occurred in early May 2004, when Mr. Perugini discovered a Hustler magazine, encased in shrink wrap, in his office mailbox. Mr. Perugini was offended by this discovery and was concerned that his co-workers might think that he had ordered the magazine, when he had not. Mr. Perugini immediately brought the incident to the attention of Tom O'Rourke, who was the Operations Manager of the WNE branch and whose group was responsible for facilities such as the branch's mailroom. Mr. O'Rourke's reaction to Mr. Perugini's news caused Mr. Perugini to suspect that Mr. O'Rourke and other Stryker employees already knew that a Hustler magazine was in Mr. Perugini's company mailbox. In an effort to determine how the magazine got into his mailbox, Mr. Perugini also spoke to an employee of an outside vendor to Stryker and to a postal employee. Mr. Perugini's conversation with the vendor's employee led him to believe that another Stryker employee, Joe Paiva, was responsible for placing the magazine in Mr. Perugini's mailbox. Mr. Paiva worked in facilities, was responsible for placing mail in the mailboxes, and Mr. Perugini had experienced problems with Mr. Paiva in the past.

Mr. Perugini was concerned about how this incident–and particularly how any report of this incident–might affect his rapport with the sales representatives he was tasked with leading, as well as his relationship with others in the WNE branch. Therefore, Mr. Perugini consulted Stryker's Employee Handbook ("Handbook") in order to ascertain the company's policy for handling allegations of sexual harassment. Stryker's Handbook states that "[t]he Company will promptly and thoroughly investigate the complaint." Notice [doc. # 27] Ex. H. The Handbook also states that the "Company will endeavor, to the extent possible, to maintain confidentiality during the investigation." *Id.*

After consulting the Handbook, Mr. Perugini contacted Lisa Hall–a Stryker human resources manager–and Gordon Little–the WNE branch manager and Mr. Perugini's direct manager–to request

that Stryker document the incident. Mr. Perugini is adamant that, at that time, he insisted that Stryker not conduct an investigation, or if it did, that the company keep the investigation confidential. Despite his request, Stryker did conduct an extensive investigation into the incident. The investigation was spearheaded by Mr. Little, Ms. Hall, Mr. O'Rourke, and John DePalma, the WNE Sales Manager. These individuals interviewed the branch's sales representatives and operations group, as well as other Stryker employees outside the WNE branch, without taking any measures to allay Mr. Perugini's concerns about maintaining confidentiality. *See* Carmody Aff. [doc. # 31] Ex. E at 106-09 ("Little Transcript"). Stryker concluded its investigation of the Hustler incident by the end of June 2004 without identifying the individual who placed the magazine in Mr. Perugini's mailbox.

Later in the summer of 2004, Sharon Brown, Stryker's newly-appointed Vice President of Trauma Sales and Marketing, decided she would reorganize Stryker's trauma sales business on a company-wide basis. *See* 56(a)(1) Statement [doc. # 27] paras. 43-44. The restructuring altered only the makeup of Stryker's trauma business, so that positions in other areas of the company's business, such as those involving the sale of orthopedic devices, were unaffected. The restructuring took the form of a company-wide reduction-in-force ("RIF") that eliminated the three then-existing levels of Stryker trauma sales personnel, including the Local Trauma Leader position occupied by Mr. Perugini. The reorganization did create several new trauma positions, however.

The new trauma positions at issue in this case were the position of Trauma Sales Manager, a management-level position, and that of Trauma Sales Associate, an entry-level position earning approximately $100,000 per year. *See* Aff. of Bryan Carmody [doc. # 31] Ex. F at 143 ("DePalma Transcript"). Ms. Brown determined that the new structure of Stryker's trauma business would require categorizing each Stryker branch according to projected trauma business and then staffing

each branch according to that designation. Each Stryker branch would be designated either as "primary," and thus staffed by five dedicated trauma salespeople (including one Trauma Sales Manager), or "secondary," and staffed by only two dedicated salespeople. Ms. Brown classified the WNE branch as a secondary branch. In the case of secondary branches, the branch manager–in this case, Mr. Little–was given discretion by Ms. Brown to staff the branch's trauma sales needs with either one Trauma Sales Manager and one Trauma Sales Associate, or with two Trauma Sales Associates.

Initially, in or about September or October 2004, Mr. Little believed that he would staff the WNE branch with one Trauma Sales Manager and one Trauma Sales Associate. At that time, Mr. Little decided that he would not recommend Mr. Perugini for the position of Trauma Sales Manager, even though some other branches were transitioning their Local Trauma Leaders into the newly-created Trauma Sales Manager position. By December 2004, however, Mr. Little had decided that he would not have a Trauma Sales Manager and would instead staff the WNE branch with two Trauma Sales Associates. Therefore, it is undisputed that the WNE branch never hired anyone for the position of Trauma Sales Manager.

Mr. Perugini learned on January 7, 2005 that he was being laid off in connection with the RIF. It is clear from the record that Mr. Perugini knew that the position of Trauma Sales Manager would be created during the course of the RIF, and he appears to have expressed some interest in that position to Mr. Little. *See* Notice [doc. # 27] Ex. R. By contrast, there is nothing in the record that shows that Mr. Perugini ever asked to move into a Trauma Sales Associate position, although before being laid off, he did apply for another position within the biotechnology division of the Stryker organization. *See* Perugini Tr. at 202-03. Mr. Perugini was not offered a job in that division, but he does not pursue in his complaint or in briefing any claim of retaliation regarding the company's

refusal to hire him in its biotechnology division.   In any event, less than two weeks after being laid off by Stryker, Mr. Perugini accepted a management-level position with one of Stryker's competitors. That position paid Mr. Perugini approximately $182,000 a year, or roughly $2,000 more than he was earning as a Local Trauma Leader at Stryker.

In this case, Mr. Perugini does not claim that the elimination of his Local Trauma Leader position in the RIF was retaliatory or that the RIF itself was implemented in order to get rid of him in retaliation for his complaint about the Hustler magazine.  Mr. Perugini likewise does not contend that Mr. Little sought to retaliate against him when Mr. Little decided to staff the WNE branch with two Trauma Sales Associates instead of one associate and a Trauma Sales Manager.  Instead, Mr. Perugini's principal complaint in this action is that when Mr. Little decided in the fall of 2004 not to offer Mr. Perugini the positions of either Trauma Sales Manager or Trauma Sales Associate, Mr. Little did so in order to retaliate against Mr. Perugini because of his complaint about finding the Hustler magazine in his mailbox.   Mr. Perugini also recites a laundry-list of other, allegedly retaliatory acts by a variety of Stryker employees from the time he raised the Hustler incident until he ultimately learned of his discharge in January 2005.  Broadly speaking, these claims concern the company's handling of the investigation into the Hustler magazine and an alleged diminution of Mr. Perugini's job responsibilities following the Hustler incident. According to Mr. Perugini, these other retaliatory acts both bolster his primary claim relating to the failure to offer him the Trauma Sales Manager or Trauma Sales Associate positions, and also independently constitute violations of Title VII.

## II.

The summary judgment standard is a familiar one.  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must draw all ambiguities and inferences in favor of Plaintiff, *see Anderson*, 477 U.S. at 255. If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials . . . ." Fed. R. Civ. P. 56(e). Rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

The Second Circuit has cautioned district courts that they must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)

(citations omitted). Nevertheless, "summary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), since "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110.

**III.**

To make out a claim of retaliation, Mr. Perugini must first show that: "(1) []he engaged in a protected activity; (2) h[is] employer was aware of this activity; (3) the employer took adverse employment action against h[im]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006). "Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . ; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

After the plaintiff has carried his initial burden, the defendant employer must articulate a legitimate, non-discriminatory reason for its actions. "Once the employer produces evidence of legitimate reasons for its actions, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the real reason for the adverse employment decision was discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003). That is, the plaintiff must produce evidence that, taken in the light most favorable to the plaintiff, would permit a jury to conclude that the employer's stated reason for its actions was false *and* that the real reason was unlawful retaliation. *See, e.g.*, *Cuttino v. Genesis Health Ventures, Inc.*, No. 3:04 CV 575(MRK), 2006 WL 62833, at *4 (D. Conn. Jan. 11, 2006) ("[T]he ultimate burden of proof shifts back to [the plaintiff] to prove that [defendant's] purported reasons are a pretext for race-based discrimination."); *Bruno*

*v. Sonalysts, Inc.*, No. 3:01CV1501 (MRK), 2004 WL 2713239, at *4 (D. Conn. Nov. 23, 2004) ("If [the defendant] provides such a reason, the burden again shifts to [the plaintiff] to provide evidence from which a jury could conclude that [the defendant's] articulated reasons for its actions are false and that the real reason for its actions was retaliation as alleged.").

In addressing Mr. Perugini's claims in this case, the Court will first discuss Mr. Perugini's core complaint – that when his job was eliminated, he was not offered a position as a Trauma Sales Manager or Trauma Sales Associate. The Court will then address the other allegedly retaliatory incidents asserted by Mr. Perugini.

## A.

There is no dispute among the parties that Mr. Perugini's complaint about finding the Hustler magazine in his mailbox constituted protected activity under Title VII, that Stryker was aware of the complaint, and that Mr. Perugini's loss of a job at Stryker qualifies as adverse action. Therefore, the sole issue regarding Mr. Perugini's core retaliation claim is whether, taking the evidence in the light most favorable to Mr. Perugini, a reasonable jury could conclude that his complaint about the Hustler magazine was the real reason why he was not offered the Trauma Sales Manager or Trauma Sales Associate positions following the reorganization of Stryker's trauma sales business in the fall of 2004. It is undisputed that the RIF at Stryker eliminated all then-existing trauma positions, including Mr. Perugini's position, and that the RIF created several new positions, including the Trauma Sales Manager position and the entry-level Trauma Sales Associate.

Mr. Perugini argues that the temporal proximity between his complaint about the Hustler magazine in May 2004 and Mr. Little's decision not to recommend him for the Trauma Sales Manager position on October 18, 2004 (when Mr. Little still planned to staff such a position) or to

9

consider him for a Trauma Sales Associate position, is sufficient to carry his burden of establishing a causal connection between his protected activity and the alleged adverse action.

Stryker responds that Mr. Little did not recommend Mr. Perugini for the Trauma Sales Manager job because Mr. Perugini did not have management experience, and because Mr. Little did not feel Mr. Perugini had "the leadership potential to move into this management role." Notice of Motion for Summary Judgment [doc. # 27] Ex. R; Ex. W.[1] Indeed, Mr. Perugini concedes that just five days before Mr. Little informed Ms. Brown that he would not be recommending Mr. Perugini for the Trauma Sales Manager role, a hospital that was one of the one of the "largest single Trauma opportunities in 2004/2005" had banned Mr. Perugini from entering the hospital because Mr. Perugini had performed inadequately in a surgery he had assisted and later failed to respond to several attempts by hospital staff to reach him for further assistance. *Id.* Ex. U. According to Mr. Little, the incident "tarnished [Stryker's] reputation . . . ." *Id.* Also, Mr. Perugini acknowledges that in the month before the hospital incident, he had slept through a meeting with one of the Stryker sales representatives whom he was responsible for leading and a physician at a hospital serviced by Stryker. *See id.* Ex. R. There is also evidence in the record that Mr. Perugini's leadership ability was in question well before the Hustler incident occurred. *See id.* Ex. K (2002 Performance Review); *see also Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff

---

[1] Mr. Little did tell Ms. Brown that he "believe[d Mr. Perugini] could potentially be an asset to the Trauma team on the marketing side . . . ." Notice [doc. # 27] Ex. W; *see* Local Rule 56(a)1 Statement [doc. # 27-2] para. 75. Ms. Brown decided not to offer Mr. Perugini a position in marketing. Since there is no dispute that Ms. Brown was the decisionmaker for the marketing position and there is no evidence that she was aware of Mr. Perugini's Hustler complaint, Mr. Perugini cannot link Ms. Brown's decision about a marketing position to Mr. Perugini's protected activity.

had ever engaged in any protected activity, an inference of retaliation does not arise."). Importantly, and in any event, all parties agree that before Mr. Perugini left Stryker, Mr. Little decided that the WNE branch would not have a Trauma Sales Manager position, and to this very day, Stryker's WNE branch has never hired any person for such a position.

Stryker does not claim that its concerns about Mr. Perugini's leadership potential had any bearing on Mr. Little's decision not to offer Mr. Perugini a job as a Trauma Sales Associate, since that was not a management position. Also unlike the Trauma Sales Manager position, the WNE branch did have Trauma Sales Associate positions following the reorganization. Instead, Stryker asserts that Mr. Little did not offer Mr. Perugini either of these sales positions because Mr. Perugini had made it clear before he even took the Local Trauma Leader position that he was not interested in a sales position at Stryker. Indeed, Mr. Little notes, Mr. Perugini had previously rejected a sales representative position at Stryker and had also rejected another position that, in Mr. Perugini's view, did not pay enough. Therefore, Mr. Little did not believe Mr. Perugini would be interested in the Trauma Sales Associate job–which was an entry-level position earning just over one-half of what Mr. Perugini was then earning and which was not a leadership position. And while Mr. Perugini told Mr. Little that he was interested in a position in the company's biotechnology division, *see* Perugini Tr. at 202-03, Mr. Perugini at no time indicated any interest in a sales position at the WNE branch, even when he was notified that he would be laid-off in January 2005. Finally, Stryker points out, less than two weeks after he was laid off, Mr. Perugini accepted a management, non-sales position with a competitor for roughly $182,000 per year, about the same as he had been earning as a Local Trauma Leader at Stryker, and significantly more than he would have made as a Trauma Sales Associate.

The Second Circuit has stated that "[n]o 'bright line . . . define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action,'" *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158 (2d Cir. 2006) (citing *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545 (2d Cir. 2001)). Indeed, the Second Circuit has found a period of one to three months did not suggest a causal connection, *see Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir.1996), and yet has found a duration of eight months need not bar such an inference, *see Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980).[2] For several reasons, the Court does not believe that the five months' duration between his Hustler complaint and Mr. Little's decisions about filling the new, post-RIF positions, is sufficient to permit a reasonable jury to conclude that there was any causal connection between the two events.

First, there is no evidence that Mr. Little or any other Stryker employee (besides Mr. Perugini) ever mentioned the Hustler complaint after the investigation concluded in June 2004, or that Mr. Perugini continued to complain about the results of that investigation. In short, other than Mr. Perugini's bald speculation and conjecture, there is no evidence in the record that his complaint about the Hustler magazine played any part in Mr. Little's later decisions about how to staff post-RIF positions.

Second, it is undisputed that the WNE branch did not hire a Trauma Sales Manager following the RIF, and at oral argument, counsel for Mr. Perugini conceded that there was no evidence that Mr.

_____

[2] Plaintiff points to *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545 (2d Cir. 2001), but unlike the plaintiffs in that case, Mr. Perugini only engaged in one instance of protected activity–the initial complaint about the Hustler magazine. In *Gorman-Bakos*, by contrast, the individuals engaged in many instances of protected speech in the five month interval between the first protected activity and the alleged adverse action.

Little's decision not to have a Trauma Sales Manager was the result of Mr. Perugini's Hustler complaint. In these circumstances, Mr. Perugini can hardly complain that his Hustler complaint was the reason he did not obtain a position that never existed. *See, e.g.*, *Petrosino v. Bell Atl.*, 385 F.3d 210, 228 (2d Cir. 2004) ("To the extent the evidence viewed most favorably to Petrosino indicates that she informally applied for acting manager positions within the I&R department, we note that she produces no evidence of any permanent acting manager vacancies in I&R within the limitations period. . . . Thus, Petrosino cannot raise a timely failure to promote claim as to any permanent acting manager position."); *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 764 (7th Cir. 2001) ("Gorence's claims regarding promotion to industrial relations manager and labor relations director fail as well because, at the time she applied for the positions, they did not exist, and no one was ever placed into those positions."); *cf. Alphonse v. State of Conn. Dept. of Admin. Servs.*, No. Civ.3:02CV1195 (MRK), 2004 WL 904076, at *5 (D. Conn. 2004) ("Since it is undisputed that Ms. Alphonse never applied to DAS for an open position as Transitional Manager and that there was no such opening available, it follows that she most certainly could not have been rejected for the position, and, further, the position could not, then, thereafter have remained open while DAS continued to seek applicants having Ms. Alphonse's qualifications, all as required for a prima facie case.").

Therefore, Mr. Perugini's retaliation claim devolves into his belief that the Hustler complaint caused Mr. Little not to recommend Mr. Perugini for two new sales positions.[3] But other than Mr. Perugini's rank speculation, there is no evidence in the record to link his Hustler complaint with Mr.

---

[3] Mr. Perugini also alleges that Mr. Little should have considered him for the position of Reconstructive Sales Representative, for which Stryker hired Christine Babini in January 2005. However, this position was not a trauma position, it was not a management position, and Mr. Perugini never displayed any interest in a sales position in the fall of 2004 or when he was notified that he was being discharged. Therefore, this claim fails for substantially the same reasons as Mr. Perugini's claim regarding the Trauma Sales Associate.

Little's decision not to offer Mr. Perugini an entry-level sales position paying just over one-half of what he was currently earning. Indeed, the only objective evidence in the record (namely, Mr. Perugini's refusal to take a sales position or a lower-paying position two years before; his failure to even inquire about the two sales positions, notwithstanding the fact that he inquired about a position as a representative in Stryker's biotechnology division; and his acceptance of a management-level position less than two weeks after his layoff from Stryker for more money) fully supports Mr. Little's belief that Mr. Perugini was not interested in these sales positions. Therefore, the Court concludes that the five-month interval in this case between Mr. Perugini's Hustler complaint and Mr. Little's post-RIF staffing decisions is insufficient, *without more*, to permit a reasonable jury to conclude that there was a causal connection between the protected activity and the company's adverse action.

Even if Mr. Perugini could demonstrate causation–and he has not done so–for much the same reasons stated above, he has also failed to produce admissible evidence that would permit a jury to conclude that the company's stated reason for failing to recommend him for the positions in question was pretextual or that the real reason was retaliatory. While Mr. Perugini notes that he is the only Local Trauma Leader in the Northeast who was not offered the Trauma Sales Manager position, it is undisputed that the WNE branch never had such a position and that it was the only Stryker branch in the Northeast that did not staff a Trauma Sales Manager position. *See* Local Rule 56(a)1 Statement [doc. # 27-2] para. 69. It is also undisputed that eight other former Local Trauma Leaders were laid-off in the RIF without being reassigned to other jobs or offered positions as Trauma Sales Managers. *See id.* para. 72. In fact, four of these individuals were discharged, despite the fact that their branches ultimately hired outside individuals as Trauma Sales Managers. *See id.* para. 77. Finally, Mr. Perugini has not shown, or even suggested, that any of the individuals who were offered positions as Trauma Sales Managers had, like Mr. Perugini, recently been barred by a major client

from entering its facility or had slept through a meeting with one of his sales representatives and a client physician. *Cf. Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.") (internal quotation marks omitted).

As to Mr. Little's failure to offer Mr. Perugini a position in sales, while Mr. Perugini's counsel represented at oral argument that, had it been offered to him, Mr. Perugini would have taken a position as a Trauma Sales Associate, counsel's unsupported assertion is belied by the undisputed facts. The Trauma Sales Associate position was an entry-level position holding no leadership potential that paid approximately $100,000 per year, or a slightly more than one-half of Mr. Perugini's $180,000 salary. Furthermore, just two weeks after he was laid off, Mr. Perugini was offered and accepted a management position with a competitor earning approximately $182,000 per year. Finally, Mr. Perugini has not provided any evidence to suggest that Mr. Little was unreasonable (let alone disingenuous or discriminatory) in believing that Mr. Perugini would not be interested in a sales position in light of the fact that Mr. Perugini had rejected a sales position with the company only a few years before. Underscoring the reasonableness of Mr. Little's belief, it is telling that Mr. Perugini never even asked Mr. Little to consider him for a position in sales. *See* Notice [doc. # 27] Ex. R. *See Petrosino v. Bell Atl.*, 385 F.3d at 227 ("[T]he requirement [of a specific job application] ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them . . . etc."); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565-66 (2d Cir. 2000) ("[A]bsent any claim that she applied for

the financial analyst position, Cruz's complaint fails to state a prima facie case for failure to promote."); *Brown v. Coach Stores*, 163 F.3d 706, 710 (2d Cir. 1998) ("In establishing a prima facie case the plaintiff must show that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.") (internal quotation marks omitted).[4]

In sum, even taking the evidence in the light most favorable to Mr. Perugini and giving him the benefit of all reasonable inferences, he has failed to produce evidence from which a reasonable jury could conclude that Stryker's stated reasons for not offering him the position of Trauma Sales Manager or Trauma Sales Associate were false and that the real reason for the company's actions was because in May 2004 he had complained about finding a Hustler magazine in his office mailbox. *See Schiano v. Quality Payroll Sys.*, 445 F.3d 597 (affirming district court's grant of summary judgment on retaliation claim); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 447 (2d Cir. 1999) (affirming grant of summary judgment for defendant on retaliation claim where plaintiff failed to put forth any evidence, beyond her own personal belief, that the defendant's articulated nondiscriminatory reason for employment action was pretextual); *Holt v. KMI-Cont'l*, 95 F.3d at 131("Plaintiff, however, has put forth no evidence to show that defendant's asserted reasons for the retaliation were pretextual.").

---

[4]While a plaintiff can be "excused from the specific application requirement, [if he can] demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer," *Petrosino*, 385 F.3d at 227, Mr. Perugini never displayed any interest in sales positions, while he did express an interest in Stryker's biotechnology division. In addition, Mr. Perugini has at no point argued that he was unaware of the Trauma Sales Associate or reconstructive sales representative positions.

**B.**

Beyond his principal claim regarding the Trauma Sales Manager and Trauma Sales Associate positions, Mr. Perugini alleges that, between his May 2004 complaint about the Hustler magazine and the fall of 2004, when he was not offered the positions mentioned above, Stryker engaged in a "pattern of antagonism" that Mr. Perugini believes evidences the company's retaliatory animus. *See* Plaintiff's Mem. of Law [doc. # 29] at 23. This conduct includes Stryker's allegedly retaliatory decision not to keep Mr. Perugini's Hustler complaint confidential, as well as a host of perceived affronts that Mr. Perugini says significantly diminished his duties at Stryker following the Hustler incident. He also contends that some of these incidents of alleged antagonism are themselves independently actionable under Title VII.

Each of Mr Perugini's subsidiary claims fails for several reasons. First, many of the incidents to which he points fail to rise to the level of adverse actions even under the more relaxed standard announced in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006). Second, even if all of the actions qualify as adverse actions under *Burlington Northern*, Mr. Perugini has failed to provide evidence that Stryker's stated reasons for its conduct was pretextual. Finally, even if Mr. Perugini could somehow demonstrate pretext, he has provided no evidence, but rather only speculation and conjecture, that "the real reason for the adverse employment decision was discrimination." *Mandell v. County of Suffolk*, 316 F.3d at 381. Accordingly, the alleged conduct, considered individually or as a whole, neither demonstrates a pattern of antagonism nor would provide a reasonable jury with an independent basis for holding Stryker liable for retaliation under Title VII.

The Company's Investigation Into Mr. Perugini's Complaint.    Mr. Perugini first says that Stryker should not have conducted an investigation of his Hustler complaint because this was

an isolated and mild instance of harassment and because he specifically requested that no investigation be conducted. According to Mr. Perugini, Stryker's decision to conduct an investigation about the Hustler magazine was in retaliation for his lodging the complaint. Stryker responds that a company's decision to conduct an investigation of an employee's complaint does not rise to the level of an adverse action under *Burlington Northern*, 126 S.Ct. 2405. Moreover, Stryker argues, even if conducting an investigation in response to an employee complaint constitutes adverse action, the company was required to conduct an investigation in accordance with its Handbook, which states that "[t]he Company will promptly and thoroughly investigate [such a] complaint." Notice [doc. # 27] Ex. H.

Assuming, without deciding, that merely conducting an investigation into a complaint that the plaintiff employee himself lodged with the company constitutes adverse action under *Burlington Northern*, the Court nonetheless agrees with Stryker that Mr. Perugini has not proffered any evidence to show that the company's decision to conduct an investigation into his complaint was false and that the real reason was retaliatory. Stryker's Handbook–if not sensible employee relations and avoidance of litigation–strongly suggested, if not required, the company to undertake some form of investigation into Mr. Perugini's Hustler complaint, given the fact that he had complained about what he believed was sexual harassment by fellow employees. Indeed, during the course of his deposition, Mr. Perugini himself characterized the Hustler incident as "an event that was very severe, very sensitive for the organization," Perugini Tr. at 197, which is in direct contrast to his current position.

Plaintiff points to *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997) to support his position that Stryker was not required to conduct a formal investigation into the Hustler complaint. But *Torres* does not permit Mr. Perugini to draw the inference of retaliatory animus he seeks. In *Torres*, the Second Circuit declined to hold the defendant company liable for failing to conduct an

investigation into plaintiff's complaint of sexual harassment, where the plaintiff's "letters . . . recounted only a few relatively minor incidents of harassment [and plaintiff] was the only victim of . . . harassment." *Torres*, 116 F.3d at 639. However, the Second Circuit confirmed that an employer's actions in such situations will vary case to case. And in *Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000), the Second Circuit confirmed that "an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer." (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Torres*, 116 F.3d at 636). In *Malik*, the Second Circuit held that a plaintiff could not recover damages for an investigation into claims that he sexually harassed other female employees, because such an investigation was required by federal law.

> [A]n employer must consider not only the behavior of the alleged offender, but also the response, if any, of its managers. Nor is the company's duty to investigate subordinated to the victim's desire to let the matter drop. Prudent employers will compel harassing employees to cease all such conduct and will not, even at a victim's request, tolerate inappropriate conduct that may, if not halted immediately, create a hostile environment.

*Malik*, 202 F.3d at 106. Therefore, Mr. Perugini has not shown that Stryker's stated reason for deciding to conduct an investigation into his complaint was pretextual or that Stryker's real reason for doing so was retaliatory.

Of course, the manner in which an employer conducts an investigation may in certain circumstances demonstrate the existence of retaliatory animus. Here, Stryker's Handbook clearly states, "[t]he Company will endeavor, to the extent possible, to maintain confidentiality during the investigation." *Id.* The record shows that Mr. Perugini was very concerned about confidentiality and made known his concern that any investigation be kept confidential. *See* Perugini Tr. at 35; Little Tr. at 79-81. There are also indications in the record that Mr. Perugini was promised by Mr. Little and Ms. Hall that their investigation would be kept confidential, to the extent possible, *see*

Little Tr. at 85, and there is clear evidence in the record that Mr. Little and the other Stryker employees made no attempt to keep the investigation confidential.

However, the undisputed evidence in the record shows that even before bringing this matter to the attention of human resources, Mr. Perugini himself discussed the incident with three individuals and never asked any of them to keep the incident confidential. It is also undisputed that several Stryker employees were in the mailroom when Mr. Perugini discovered the Hustler in his mailbox, and even Mr. Perugini inferred that multiple employees knew about it long before the company conducted its investigation. *See* Perugini Tr. at 96-97. Therefore, it is difficult to see how Stryker's failure to conduct a confidential investigation "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. at 2415, when Mr. Perugini had already brought the Hustler incident to the attention of several people, including one manager.

Furthermore, while the company may have contravened its guidelines or own assurances in the manner in which it conducted the investigation–something the Court need not and does not decide–there simply is no evidence of retaliatory animus in this case. The Stryker Handbook provides no guidelines for how an investigation should be conducted, and Mr. Perugini has provided no evidence of how Stryker has conducted other investigations or even suggested how Stryker could have gone about discovering who placed the magazine in Mr. Perugini's mailbox without interviewing employees about the incident and disclosing where the magazine was discovered. Finally, in his deposition, Mr. Perugini testified that he believed Mr. Little handled the discovery of the Hustler magazine appropriately. *See* Little Tr. at 95-96. Therefore, Mr. Perugini has not proffered evidence that would permit a reasonable jury to conclude that Stryker's stated reason for conducting the investigation in the manner that it did was false or retaliatory.

The Company's Alleged Reduction of Mr. Perugini's Job Responsibilities.    Mr. Perugini asserts that, in response to his complaint about the Hustler magazine, Stryker stripped him of his job responsibilities, including (1) depriving him of input and involvement with personnel decisions; (2) denying him contact with customers; (3) depriving him of involvement in strategy discussions and decisions concerning Stryker's trauma business; (4) restricting his information about the future of Stryker's trauma business and business structure; and (5) preventing him from attending various management meetings.

Stryker first notes that, to the extent any of these actions occurred after October 18, 2004, the day Mr. Little decided not to offer Mr. Perugini another position at the WNE branch, the actions occurred as a result of that decision, which effectively meant that Mr. Perugini would no longer be a Stryker employee as of January 2005.  Stryker further asserts that the personnel decisions that Mr. Perugini complains of did not involve individuals directly responsible for trauma products, and most of the other actions about which he complains were the result of day-to-day business decisions principally taken by Mr. DePalma, whom Mr. Perugini has not claimed retaliated against him for reporting the Hustler incident.  Finally, Stryker points out that Mr. Little excluded Mr. Perugini from discussions regarding the RIF and the future of Stryker's trauma business because Mr. Little had been directed by Ms. Brown (who knew nothing of the Hustler complaint) not to discuss the RIF with employees who might be discharged, and that the one meeting Mr. Perugini did not attend and which did not involve the future of the trauma business was impromptu and not designed to exclude Mr. Perugini because of his complaint about the Hustler magazine.

These claims principally fail because it is clear that, even stringing together every conceivable adverse action between May and December, Mr. Perugini has simply produced no evidence that Stryker's stated reasons for taking these actions were pretextual and that "the real reason for the adverse employment decision was discrimination." *Mandell v. County of Suffolk*, 316

F.3d at 381. For example, Mr. Perugini alleges that he was deprived of involvement in the hiring of Kevin Finn in the summer of 2004. As an initial matter, it is not at all clear that depriving an employee of a single opportunity to interview a prospective employee constitutes adverse employment action under *Burlington Northern*. However, even if it were, the undisputed evidence shows that Mr. Finn reported directly to Mr. DePalma and that Mr. Finn had no direct trauma responsibility when he was hired. *See* Response to Plaintiff's Local Rule 56(A)2 Statement of Undisputed Facts [doc. # 35] para. 10. Mr. Perugini provides no evidence that the company's stated reason for excluding him from the interview was false and that the real reason for the actions of Mr. DePalma (whom Mr. Perugini has not accused of retaliation) was retaliatory.

Mr. Perugini also claims that he was not consulted with respect to the price of certain trauma products offered to St. Raphael's Hospital, and was prevented from meeting clients in connection with pricing and other service-related issues. Stryker responds that Mr. Perugini was consulted on the St. Raphael's pricing decision, and that on the other issues, Mr. Little simply deferred to the judgment of Mr. DePalma, the WNE Sales Manager, who disagreed with Mr. Perugini's position. Once again, even accepting all facts in favor of Mr. Perugini, and assuming, without deciding, that these incidents rise to the level of adverse actions under *Burlington Northern*, Mr. Perugini has failed to demonstrate that these actions were causally connected to his Hustler complaint.

In fact, counsel for Mr. Perugini admitted at oral argument that the pricing decision was made by Mr. DePalma, not Mr. Little, and that there was no evidence that Mr. Little–whom Plaintiff contends is the real villain in the case–forced Mr. DePalma to exclude Mr. Perugini from the pricing discussions at St. Raphael's. In his deposition, Mr. Perugini concedes that Mr. DePalma was responsible for excluding him from these meetings with clients, and he merely surmises that Mr. Little must have had something to do with Mr. DePalma's decisions. *See* Perugini Tr. at 153-58. But the short answer to Mr. Perugini is that at this stage of the proceeding, surmise and suppositions

do not suffice. *See Schwapp*, 118 F.3d at 110. Because Mr. DePalma was also responsible for the decisions on technological upgrades and sales incentives from which Mr. Perugini alleges he was excluded, those claims must also fail. *See Foster-Bey v. Potter*, 296 F. Supp. 2d 195, 209 (D. Conn. 2003); *cf. McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir. 1997) (holding that the discrimination must be attributed to the decisionmaker directly).[5]

Mr. Perugini asserts that he was systematically excluded from management meetings that he had attended in the past. Yet, the only evidence in the record that such management meetings actually occurred in the relevant time period is Mr. Little's recollection that one informal meeting occurred and that Mr. Perugini was not deliberately excluded. *See* Little Tr. at 272-73. While Mr. Perugini surmises that more meetings must have been held, he provides no evidence of any meetings other than the one informal meeting recalled by Mr. Little. It is less than clear to the Court that excluding an employee from a single meeting constitutes adverse employment action, but even if it did, Mr. Perugini provides nothing "more than conclusory allegations of discrimination" that are not based upon his personal knowledge. *See Schwapp*, 118 F.3d at 110. Mr. Little testified that the only "management meeting" between May and October was not a formal meeting at all, but rather an impromptu meeting that Mr. Perugini either did not attend or was unable to attend because he was not in the office that day. *See* Little Tr. at 273. Mr. Perugini provides no evidence to the contrary.

---

[5] Mr. Perugini also alleges that Stryker retaliated against him because a human resources employee–Teresa Prentiss–failed to intervene after Mr. Perugini contacted her on November 9, 2004 to complain about hostility he faced from other co-workers. Mr. Perugini provides no evidence that Ms. Prentiss had anything to do with the Hustler investigation or even knew about it, let alone harbored any retaliatory animus against Mr. Perugini. Therefore, this claim also fails. *See McLee v. Chrysler Corp.*, 109 F.3d at 137 ("[I]t is undisputed that Broderdorf . . . made the decision to fire [the plaintiff], and [the plaintiff] has conceded that Haas was not consulted about that decision. Claims of Haas's bias, asserted by [the plaintiff] upon learning he was to be discharged, provide no basis for imputing to Broderdorf an invidious motivation for the discharge.").

Mr. Perugini also complains that after lodging the Hustler complaint, Mr. Little failed to acknowledge Mr. Perugini's accomplishments and exaggerated his errors.  However, Mr. Perugini has not contested that he was barred from entering St. Raphael's Hospital after an unsatisfactory case he conducted there and after he failed later that day to return several attempts by hospital staff to reach him for assistance with another case.  And, while Mr. Perugini disputes the severity and ramifications of his sleeping through an August 2004 meeting with one of the sales representatives he was tasked with leading and a client physician, he does not contest that he failed to attend the meeting because he was sleeping.  Mr. Perugini also acknowledged that, even before his Hustler complaint, he had difficulty engaging the sales force, *see* Hays Aff. [doc. # 27] Ex. J, and that a pre-Hustler review of his performance had reiterated that failing as something that needed his attention, *see id.* Ex. I at 3, Ex. K.[6]  Once again, therefore, Mr. Perugini has offered no evidence, other than his own subjective feelings of injustice, that Mr. Little exaggerated Mr. Perugini's unfavorable performance or minimized his accomplishments in retaliation for the Hustler complaint.

Finally, Mr. Perugini's alleges that he was excluded from a year-end management meeting and from the hiring and interview process for Raul Lopez, Christine Babini, and Scott Cremmins.  However, these events, each of which concerned the future direction of Stryker's trauma business, occurred after October 18, 2004.  By that time, Stryker had decided that Mr. Perugini would soon be leaving the company.  And, as noted above, Mr. Perugini has produced no evidence that Stryker's proffered reason for excluding him from these meetings was either pretextual or retaliatory.

Therefore, the Court concludes that Mr. Perugini's litany of post-complaint events and

---

[6] Mr. Perugini points to Mr. Lopez and Mr. DePalma as examples of individuals who also had behavioral issues or complaints from co-workers and who were either not censured or who were promoted.  However, Mr. Perugini has not alleged that either had been thrown out of a significant hospital or had slept through a meeting with an individual he was tasked with leading.  Moreover, Mr. Perugini  has provided no admissible evidence that these individuals were not reprimanded or censured for their conduct. *See Graham*, 230 F.3d at 39.

conduct does not show a pattern of animosity and that no reasonable jury could conclude that they constituted independent acts of retaliation for his Hustler complaint in violation of Title VII.

## IV.

In light of the Court's dismissal of the only federal cause of action pled in the complaint, the Court, exercising its discretion under 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the remaining state causes of action. The Second Circuit has advised district courts that "'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine–judicial economy, convenience, fairness, and comity–will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). This is the "usual case" envisioned in *Valencia*. All that remains in this case are claims that involve complex issues of state law. Therefore, in the interests of judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Mr. Perugini's claims for retaliation under CFEPA, breach of contract, and promissory estoppel.

## V.

The Court GRANTS IN PART Defendant's Motion for Summary Judgment [doc. # 27]. Judgment should enter for Defendant and against Plaintiff on Count One of the Complaint, which alleges a Title VII violation. The Court DISMISSES for lack of jurisdiction Counts Two, Three, and Four of the Complaint, which allege retaliation under CFEPA, as well as breach of contract and promissory estoppel. Plaintiff may re-file his state law claims in state court. Each side shall bear its own costs and attorneys' fees. **The Clerk is directed to close this file.**

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: February 22, 2007.**